Matthew **DELMONTE and Lee Ann Delmonte, Plaintiffs,**

v.

**LAIDLAW ENVIRONMENTAL SERVICES, INC., Defendant.**

**No. Civ.A. 98–10463–MEL.**

United States District Court, D. Massachusetts.

April 12, 1999.

John A. Dalimonte, Karon & Dalimonte, Boston, MA, for Matthew Delmonte, Lee Ann Delmonte, plaintiffs.

William F. Joy, Jr., Joseph McConnell, Morgan, Brown & Joy, Boston, MA, for Laidlaw Environmental Services (North East), Inc., defendant.

### MEMORANDUM AND ORDER

LASKER, District Judge.

Matthew and Lee Ann Delmonte between them assert fifteen claims against Laidlaw Environmental Services, Inc. All of the claims center on the contention that in early 1997, Laidlaw, then the employer of Mr. DelMonte and the former employer of Mrs. Delmonte, unlawfully interfered with their rights to marry. Each plaintiff alleges: a claim under the Massachusetts Civil Rights Act; a claim under the Massachusetts Declaration of Rights; intentional interference with the contract of marriage; and intentional and negligent infliction of emotional distress. Mr. DelMonte adds: various claims of employment discrimination under M.G.L. ch. 151B; a violation of the Massachusetts Equal Rights Act; breach of an employment contract; and breach of the covenant of good faith and fair dealing relating to that contract. Mrs. DelMonte asserts an additional claim for interference with contractual relations with her then current employer.

To complete the roster, plaintiffs move to amend the complaint to add one claim each of unreasonable interference with privacy, in violation of M.G.L. ch. 214, § 1B. Mr. DelMonte seeks also—based on Laidlaw's representations to the Court that his employment was at-will as opposed to contractual—to add a claim for wrongful discharge, a fallback to his claim for breach of contract.

Laidlaw moves under Rule 12(b)(6) to dismiss the complaint for failure to state a claim. It likewise opposes plaintiffs' motion to amend on futility grounds. For substantially the reasons articulated in defendant's papers, the motion to dismiss is granted, and the motion to amend is denied.

### I.

The complaint [1] alleges:

Mr. DelMonte worked as a Field Chemist in the Field Services Division of Laidlaw beginning in April of 1994. In about May, 1995, he developed a romantic relationship with his supervisor at the time, then Lee Ann Merashoff. In August, 1996, Ms. Merashoff was laid off by Laidlaw; she subsequently obtained employment with another company. Mr. Del-

---

1. The proposed amended complaint does not differ meaningfully from the initial complaint except for the addition of the three claims noted above.

Monte and Ms. Merashoff continued dating after she left Laidlaw.

In mid-January, 1997, Mr. DelMonte announced to co-workers at Laidlaw that he and Ms. Merashoff had become engaged to be married. The following week, he was approached by the facility sales manager. According to the complaint, the manager gave Mr. DelMonte a "24–hour ultimatum to resign, force his fiancee to resign from her employment, or be terminated".[2] At no time prior to issuance of the ultimatum had anyone at Laidlaw expressed disapproval of his relationship with Merashoff. The ultimatum resulted shortly thereafter in Mr. DelMonte's leaving his employment. Sometime after that, the plaintiffs were married.

The complaint further states that: (1) Laidlaw, in issuing the ultimatum, "attempt[ed] to coerce Mr. DelMonte into choosing his job over his right to marry" and "attempt[ed] to coerce [then Ms. Merashoff] into quitting her job in order to exercise her right to marry"; (2) Mr. DelMonte "is Catholic and recognizes marriage as an important sacrament"; and (3) Laidlaw employs other persons who are married to persons "who work for other companies."

## II.

Neither the complaint, nor the proposed amended complaint, alleges facts sufficient to state a claim under any of the plaintiffs' assorted theories of recovery.

As a starting point, Mr. DelMonte's breach of contract claim (Count 7) must be dismissed—not only because he now seeks to replace it with an alternative, wrongful termination claim. Dismissal is warranted also because of the total inadequacy of the only allegation by plaintiffs that even arguably touches on the existence of an employment contract. Specifically, the com-plaint states merely that "[d]efendant's constructive discharge of [Mr. DelMonte] breached an implied and/or written employment contract," without identification of either the pertinent terms of the purported contract, or the manner in which Laidlaw's conduct is said to have breached those terms. Such a "bald assertion" is insufficient against a Rule 12(b)(6) motion. *See Chongris v. Board of Appeals*, 811 F.2d 36, 37, *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987).

■ A further consequence of the insufficiency of plaintiffs' pleading as to the existence of an employment contract is the dismissal of the claim of breach of the implied covenant of good faith and fair dealing (Count 8). Although the Supreme Judicial Court ("SJC") has, unlike many other courts, extended the implied covenant doctrine to protect at-will employees, it expressly limits that extension to cases in which the employee was, at the time of termination, entitled to some outstanding, unpaid monetary benefit. *See Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1125 (1st Cir.1995) (citing *Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 438 N.E.2d 351 (1982), and *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977)). Because the complaint contains no allegations whatever of Laidlaw's conduct having deprived Mr. DelMonte of any unpaid financial benefit, it fails to state a claim for breach of the implied covenant.

Nor may Mr. DelMonte, having been an at-will employee, or Mrs. DelMonte, maintain an action under the Massachusetts Civil Rights Act (Counts 1 and 9). The "MCRA" provides in relevant part:

> Whenever any person or persons, whether or not acting under color of law, *interfere by threats, intimidation or coercion*, or attempt to interfere by

---

2. Plaintiffs do not, in either the complaint or their opposition papers, express an opinion, allegation, or claim as to Laidlaw's reason for issuing the ultimatum, and Laidlaw itself does not offer an explanation. Despite the one

allusion to Mrs. DelMonte's new employer being a competitor of Laidlaw, which appears only in the defendant's 12(b)(6) brief, the complaint in fact does not make such an allegation.

threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of *rights secured by the constitution* or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general [or any person acting on his own behalf] may bring a civil action....

M.G.L. ch. 12, §§ 11H, 11I (emphases added). Plaintiffs contend that Laidlaw's ultimatum constituted the requisite "interfere[nce] by threats, intimidation or coercion," with the "secured right" at issue being the "right to marry."

Both sides make numerous arguments on the MCRA claims which are confusing at best, and without merit.[3] These warrant no further attention. The problem, however, for plaintiffs, is that Laidlaw raises at least one good argument, which, though not fully developed, is plainly dispositive of the MCRA claims. Specifically, Laidlaw contends, correctly, that the "MCRA requires that the secured right be abrogated by threats, intimidation or coercion," and the alleged ultimatum "on its face does not constitute a threat, intimidation or coercion."

■ The SJC held in *Webster v. Motorola, Inc.*, 418 Mass. 425, 429–430, 637 N.E.2d 203 (1994), that, regardless of the nature and import of the implicated "secured right," an employer's threat of the loss of at-will employment does not constitute interference which is actionable under the MCRA. The plaintiffs in *Webster* also alleged interference with a "secured right" of privacy (the actual right to physical, bodily privacy implicated by drug testing

programs), and they, like Mr. DelMonte, were *at-will* employees. The Court held that conditioning at-will employment on a restriction of the exercise of a secured right is not an MCRA "threat, intimidation or coercion" because, in essence, at-will employees are not entitled to their employment, and therefore do not, when threatened with its loss, reasonably suffer coercion or intimidation. *See also Willitts v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210–11, 581 N.E.2d 475 (1991). So here, even assuming that the "right to marry" constitutes a "secured right," because Mr. DelMonte was an at-will employee, the alleged conduct by Laidlaw is not actionable under the MCRA.

Mrs. DelMonte's MCRA claim is doubly vulnerable. To the extent she is complaining about "interference with" her *husband's* employment, the claim is dismissed under the rule of *Webster* and *Willitts*. To the extent the claim rests on a contention that Mrs. DelMonte's *own* employment was interfered with, it cannot survive. Considering it is not alleged that Laidlaw maintained any control whatsoever over her employment at her new company, only *Mr.* DelMonte's employment could even theoretically have been "threatened" by Laidlaw.

Mr. DelMonte's claims of employment discrimination under M.G.L. ch. 151B (Count 3) must also be dismissed. The complaint states merely that: (1) "Matthew DelMonte is Catholic and recognizes marriage as an important sacrament"; and (2) Laidlaw's issuance of the ultimatum "interfered with or attempted to interfere

---

3. Laidlaw, for example, argues: (1) that the MCRA's protections do not cover Mr. and Mrs. DelMonte because "[i]t is established that *employment* is not a "secured right" sufficient to support a[n] MCRA claim," (emphasis supplied), when the claims actually concern, quite clearly, the "secured right" of the "right to marry"; and (2) that a "right to marry" cannot support an MCRA claim because an *agreement* to marry is unenforceable and therefore not a secured right, missing the distinction between a claim of such a contrac-

tual right and plaintiffs' claim. In response, plaintiffs appear to argue, with equally little merit, that the SJC's statement in *Webster v. Motorola, Inc.*, 418 Mass. 425, 430, 637 N.E.2d 203 (1994), that "a plaintiff could maintain a cause of action under MCRA where the employer's measures are directed toward a particular individual," *automatically* grants them causes of action under the Act because Laidlaw's conduct was directed to only them.

with the exercise or enjoyment of [plaintiff's] *religious* right *to marry.*" (emphases supplied). Only a generous reading of the allegations and plaintiffs' opposition brief sheds light on the precise nature of his claims.

Mr. DelMonte raises on brief two different sub-sections of chapter 151, § 4. With respect to § 4(1),[4] he asserts two theories of recovery: one based on religion, the other founded upon his "marital status" of being engaged to be married. He further claims, with respect to § 4(1A),[5] that Laidlaw unlawfully imposed, as a condition of employment, an ultimatum that interfered with his "sincerely held religious belief in marriage." Neither the "religion" claims, nor the "marital status" claim, have merit.

■ The complaint fails to state a *religion*-based claim under § 4(1) because it contains no allegations that Laidlaw's issuance of the ultimatum was "because of" plaintiff's religious creed or beliefs. Mr. DelMonte fails to allege even the requisite threshold fact that in January, 1997, Laidlaw knew, or understood, that he held a *religious* belief valuing marriage. The relevant portion of § 4(1) clearly prohibits only adverse employment action which is "because of," or *based on,* religion.

■ Plaintiff's claim of a "marital status" violation of § 4(1) must also be dismissed. Section 4(1), *see* note 4, does not include "marital status" or the like in the list of characteristics it addresses. Moreover, plaintiff cites no authority for the unlikely proposition, presented in his papers, that "marital status" comes within the purview of the 151B prohibition on *sex*-based discrimination.[6] Engaged or married persons simply do not constitute a "protected class" under chapter 151B,

4. Sub-section (1), in relevant part, makes it unlawful "[f]or an employee ... because of ... the religious creed ... of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment...."

5. Sub-section (1A) provides in relevant part that: "[i]t shall be unlawful discriminatory practice for an employer to impose upon an individual as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such individual to violate, or forego the practice of, his creed or religion...." It later specifies that "[a]s used in this subsection, the words 'creed or religion' mean any sincerely held religious beliefs, without regard to whether such beliefs are approved, espoused, prescribed or required by an established church or other religious institution or organization." The amendment, further mentioned below, became effective February 27, 1997.

6. Plaintiff relies on the decision of the Massachusetts Commission Against Discrimination ("MCAD") in *Ntapalis v. Halem & Schrader, P.C.,* 14 Mass.Discrim.Law Rptr. 1172 (1993), for his claim that "[a] bias against marriage becomes a protected category under 151B if based upon sex[, and i]t naturally follows that any bias against marriage based upon a reli-

gious practice will also become a category protected under 151B."

Presumably, plaintiff understands that *Ntapalis* did not actually hold that marital status "becomes" a protected status "if based upon sex." Rather, the case actually affirmed that marital status is never itself protected under chapter 151B, stating quite clearly that:

[a] Complainant could [make out] a *prima facie* case of *sex* discrimination if she showed that single women [employees] were encouraged to remain single, and single *men were not....* An employer's preference for single employees [like *any* preference] is not on its face evidence of sex discrimination. The burden is squarely on the Complainant to establish that employer preferences for single employees applies unequally to both women and men.

(emphases supplied). What "naturally follows" is not what plaintiff urges, *see* quotation of argument above, but the rather unremarkable proposition that an employer who treats engaged employees with certain religious beliefs differently from engaged employees not holding such beliefs, and does so "because of" those religious beliefs, subjects itself to chapter 151B, § 4(1) liability. As is discussed *supra* at 94, the complaint contains no such allegations. *Pielech v. Massasoit Greyhound, Inc.,* 423 Mass. 534, 668 N.E.2d 1298 (1996), which also is relied on by plaintiffs here, is equally unavailing, as the case has nothing whatsoever to do with § 4(1).

§ 4(1). *See Huff v. Chapel Hill Chauncey Hall School,* 16 Mass.Discrim.Law Rptr. 1605 (1994),[7] *aff'd* Mass.Discrim.Law Rptr. 1247 (1995); *Ntapalis v. Halem & Schrader, P.C.,* 14 Mass.Discrim.Law Rptr. 1172 (1993).

Mr. DelMonte's third discrimination claim is that the ultimatum also violated chapter 151B, sub-section 4(1A), *see* note 5, as that provision was applied in *Pielech v. Massasoit Greyhound, Inc.,* 423 Mass. 534, 668 N.E.2d 1298 (1996). He cites *Pielech* as an example of the SJC having "decided that to impose upon an individual as a condition of employment any condition which would cause that person to violate his or her practice of religion as required by that religion is unlawful under c. 151B § 4." This is a mischaracterization of the *Pielech* holding.

The *Pielech* plaintiffs, whose employment had been terminated when they refused, purportedly because of religious beliefs, to work on Christmas Day, brought claims under § 4(1A). The SJC, while leaving open the viability of similar claims under better-drafted legislation, struck down the sub-section as it then stood as unconstitutional, for violation of the Establishment Clause of the United States Constitution. The Court reasoned that by its plain language, § 4(1A) protected only those whose religious beliefs were tied to established religious groups or institutions.

■ *Pielech* was decided on August 20, 1996. The legislature did not make effective its amendment to the statute [8] until February 27, 1997, which was at least one

month *after* the purportedly culpable conduct of Laidlaw. Accordingly, Mr. DelMonte's chapter 151B, § 4(1A) claim must be dismissed for the same reasons the SJC dismissed the *Pielech* claims.[9]

■ Mr. DelMonte's claim under the Massachusetts Equal Rights Act ("MERA"), M.G.L. ch. 93, § 102 (Count 2) is also without merit. As Laidlaw correctly contends, the complaint lacks factual allegations which, if proven, would establish plaintiff as a member of a class protected by MERA. Specifically, section 102 provides in relevant part:

> All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, ... to the full and equal benefit of all law. ...

Mr. DelMonte's claim is that while others employed by Laidlaw were permitted to be married to persons employed outside the company, his own exercise—or *anticipated exercise* —of that right, was interfered with, and that he was therefore culpably treated in a manner unequal to that his co-workers experienced. Plaintiff presents no authority for his apparent, rather extreme, claim that *any* differential treatment of *any* employees falls within the purview of the Equal Rights Act. Such a contention would be incorrect as a matter of law.

■ Mr. and Mrs. DelMonte each bring one claim of both intentional *and* negligent

---

7. While the parties' briefs, and indeed the Court's own research, failed to reveal any court decisions on point, this recent MCAD decision points out that § 4(1) "includes a litany of characteristics that employers are forbidden to take into account when making employment decisions[, and] marital status is not among them. It is significant that in subsection 6 [of chapter 151B], which addresses housing discrimination, marital status is a protected class. ... The [legislature] expressly chose to make marital status a protected class in housing but not in employment."

8. The response was to add the statement quoted above, *see* note 5, clarifying the subsection's use of the term "creed or religion."

9. Moreover, even if the effective date of the new statute had been earlier, the complaint as pled would fail to state a cause of action under § 4(1A). The fact that "Mr. DelMonte is Catholic and recognizes marriage as an important sacrament" simply does not equate to an allegation of "sincerely held religious beliefs."

infliction of emotional distress. Mr. Del-Monte's claims (Counts 5 and 6) are dismissed as barred by the Massachusetts Worker's Compensation Act, M.G.L. ch. 152. The SJC has ruled that claims of emotional distress inflicted in the context of covered employment are barred by the exclusivity provision of the Act, M.G.L. ch. 152, § 24. *See Green v. Wyman–Gordon Co.*, 422 Mass. 551, 558–61, 664 N.E.2d 808 (1996); *Foley v. Polaroid Corp.*, 381 Mass. 545, 548, 413 N.E.2d 711 (1980).

Moreover, even if the statutory bar did not apply, the DelMontes' claims for intentional infliction of emotional distress (Counts 5 and 11) must be dismissed. Under Massachusetts law, such a claim requires a plaintiff to establish that the defendant's conduct was "extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community," and that the emotional distress claimed by plaintiff have been "severe and of such a nature that no reasonable person could be expected to endure it." *See Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466, 681 N.E.2d 1189 (1997); *Payton v. Abbott Labs*, 386 Mass. 540, 555, 437 N.E.2d 171 (1982). The DelMontes do not respond to defendant's contention that they have failed to allege any facts giving rise to an inference that the putative conduct met the above-articulated standard, and the Court is aware of no case law case law casting doubt on the contention.

Nor does Mrs. DelMonte's claim of negligent infliction of emotional distress survive. The elements of such a claim are: negligence; emotional distress; some resulting physical harm "manifested by objective symptomatology"; causation; and reasonableness in the suffering of the distress. *Id.* at 557, 437 N.E.2d 171. Laidlaw focuses, appropriately, on plaintiff's allegations of negligence. As with any sort of negligence, negligence in the context of an emotional distress claim requires that the defendant have owed plaintiff a duty of care that was breached in

some way. *Urman v. South Boston Savings Bank*, 424 Mass. 165, 171, 674 N.E.2d 1078 (1997). Laidlaw's argument that Mrs. DelMonte fails to allege facts as to any legal duty running from the company to her is persuasive.

Counts 4 and 10 assert plaintiffs' respective claims for intentional interference with contractual relations. Specifically, they allege that Laidlaw "interfered with, or attempted to interfere with, by intimidation, threats and/or coercion, with [sic] the contract *of marriage*." (emphasis supplied). Plaintiffs' brief clarifies that the wrongful conduct alleged as the basis for these counts is, once again, Laidlaw's issuance of the ultimatum to Mr. DelMonte. What is *not* clear, from either the papers or plaintiffs' oral argument, is whether the contract they focus on is the actual contract "of marriage," or the contract "*to marry*," i.e., to get married in the future. As defendant correctly argues, however, regardless of how the complaint is construed, its fails in Counts 4 and 10 to state claims for intentional interference with contractual relations.

To succeed on a claim of intentional interference, the contract at issue must have been valid. Nolan and Sartorio, *Tort Law* (2d ed.1989), Mass. Practice Series vol. 37, § 97, 122–23. Under Massachusetts law, a contract to get married in the future is unenforceable, *see Conway v. O'Brien*, 269 Mass. 425, 169 N.E. 491 (1929), and the legislature has enacted that the breach of an agreement to marry "shall not constitute an injury or wrong recognized by law," M.G.L. ch. 207, § 47A. Accordingly, Laidlaw could not have culpably interfered with the engagement agreement existing between Mr. DelMonte and Ms. Merashoff at the time of the ultimatum.

If plaintiffs' claims are, alternatively, that Laidlaw's ultimatum interfered with their eventual contract *of* marriage, they nevertheless must be dismissed. That contract simply did not exist in Janu-

ary, 1997; it was merely *prospective.* While intentional interference claims ordinarily involve *existing* contracts, section 766(B) of the *Restatement (Second) of Torts* does provide that in some circumstances a claim may lie where a merely *prospective* contract is at issue. To prevail on such a claim, however, the plaintiff must have suffered actual, pecuniary loss as a result of the interference. Because the DelMontes, complaint is devoid of any such allegations, the claims of intentional interference with contractual relations—if they are understood to involve the contract of marriage—are dismissed.

 Mrs. DelMonte brings an additional claim of intentional interference with a contract of employment under which she says she was working at the time of the ultimatum (Count 13). As Laidlaw correctly points out, however, the elements of intentional interference are: (1) the existence of a contract between plaintiff and a third party; (2) the defendant's knowing inducement of that third party to breach the contract; (3) defendant's conduct having been "improper in motive or means"; and (4) injury to the plaintiff. *See G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363 (1991). At least with respect to the second element, the complaint is insufficient. Mrs. DelMonte fails even to allege the necessary inducement, and there are no allegations that Laidlaw's ultimatum ever reached the ears of her employer. Neither does the complaint allege that the claimed employment contract was actually breached by the employer.

 Finally, the DelMonte's claims of direct violations of the Massachusetts Declaration of Rights (Counts 14 and 15) are dismissed because Laidlaw was not a state actor, and nor is it alleged that it was. *See Tynecki v. Tufts Univ. School of Dental Medicine,* 875 F.Supp. 26, 30 n. 5 (D.Mass. 1994) (claims under the Massachusetts Constitution require a "deprivation of

rights fairly attributable to the State") (citing *Horsemen's Benev. and Protective Ass'n v. State Racing Comm'n,* 403 Mass. 692, 532 N.E.2d 644 (1989), and *Phillips v. Youth Development Prog., Inc.,* 390 Mass. 652, 459 N.E.2d 453 (1983)).[10]

*The Motion to Amend*

Despite the fact that leave to amend a complaint is ordinarily liberally granted, the motion to amend is denied because the proposed new claims are without merit.

 Both DelMontes claim that their privacy was invaded in violation of M.G.L. ch. 214, § 1B (proposed Counts 16 and 17). Section 1(B) provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." The proposed amended complaint alleges: "Defendant's ultimatum to [Mr. DelMonte] unreasonably, substantially, and/seriously interfered with [their] right[s] to privacy." Such a conclusory allegation is insufficient. *See Chongris,* 811 F.2d at 37. Moreover, even considering that the constitutional "right to marry" is founded on the constitutional "right to *privacy,*" no authority has been suggested for the doubtful proposition that the conduct alleged implicated "privacy" within the meaning of M.G.L. ch. 214, § 1B. Cases brought under the statute typically concern more tangible invasions of bodily privacy such as drug testing, *see e.g., Webster,* 418 Mass. 425, 637 N.E.2d 203, and, as Laidlaw correctly points out, no such "private facts" are involved here.

 Proposed Count 7, asserting a claim for wrongful discharge, alleges that Laidlaw unlawfully terminated Mr. DelMonte by issuing its ultimatum when public policy dictated against interference with the "right to marry." The Massachusetts "public policy exception" to the at-will doctrine, however, is narrow, and requires that the challenged discharge have "directly contradict[ed] *well-defined* public policies of the Commonwealth." *See Upton v.*

10. Plaintiffs actually do not even defend these claims in their opposition brief.

*JWP Businessland,* 425 Mass. 756, 757, 682 N.E.2d 1357 (1997) (emphasis added). As Mr. DelMonte has failed to demonstrate that such a public policy exists, either by court decision or legislative action, the proposed new claim would be futile.[11]

As Laidlaw correctly states, Massachusetts courts have neither expressed such a policy, nor automatically applied the public policy exception simply because a constitutional or otherwise significant right is implicated in a termination. Nor has the legislature—whose pronouncements are the more common source of the requisite "well-defined" policy, *see Upton,* 425 Mass. at 759, 682 N.E.2d 1357—enacted statutes even suggesting its adoption or promotion of such a policy. The statutes concerning marriage which are cited by plaintiff simply do not rise to the level of public policy pronouncement that is required by Massachusetts wrongful discharge law. *See id.* (rejecting argument that statutes and state policies stressing the import of child welfare and protection demonstrate a "public policy" sufficiently well-defined to permit a wrongful discharge claim by parent with significant child-care needs).

\* \* \* \* \* \*

For the foregoing reasons, defendant's Rule 12(b)(6) motion to dismiss is allowed as to all counts of the complaint, and plaintiffs' motion to amend to add further claims is denied. The case is dismissed.

It is so ordered.

---

11. Plaintiff mistakenly focuses his entire defense of the proposed Count 7 on the virtually contested proposition that the claimed "right to marry" exists. Despite the Court's explicit invitation to do so in supplemental briefing, Mr. DelMonte neglected to address the real question of whether the alleged public policy against interference with marriage actually exists.